This is a caveat to the alleged will of George M. Bennett, deceased, the paper-writing propounded as his will being in the following language:
Nov. 11, 1917.
DEAR FRIEND: — I will try and write you a few lines to let you here from me, I am still shut up for measles but haven't broke out but I am some sick. My feever is a 104 and I am a hurting through my breast and I cough so at night I can't sleep and I don't want nothing to eat. I will be sent to the Hospital as soon as I brake out I hope I will get along all right and I truly hope you all are well but beleve me I am some blue today this is wrote on Sunday evening but you cant hardly tell the difference only they drill on Sunday there is a lot works right on and play match games all day and gamble and do any thing except something good. J S I feel so bad. I cant write but a few lines tell all that I send my love to them and I hope God will be with me until we meat again.
I will have to close for this time and you write and let me here from you I dont know wher I will be able to answer or not but George H. Hodges sed he would git my mail to me. Answer soon, from a loving friend, G. H. Bennett.
Iff aney thing happens to me I want you to have ever thing I got in the world and I will have it fixed iff I can have the chance for you have done moore for me than aney one on earth,
from one who love you,
G. M. BENNETT.
There was testimony tending to show that the alleged testator was an enlisted soldier of the United States, and stationed at Camp Jackson, near Columbia, S.C., and that, at the time he wrote the letter to J. S. Lewis, the general beneficiary of his property named in the paper above set out, he was very sick in camp, where he died 13 or 14 November, 1917, and that the letter and address on the envelop in which it was enclosed were all in his handwriting. J. S. Lewis testified that Bennett had worked with him five or six years before going to the great war; that he was not related to him, and that Bennett had a father and a sister now living. That he owned real estate, but he did not know how much. He went to see him at the camp as soon as he heard of his condition, *Page 7 
but arrived there only thirty minutes before he died. There was also testimony that he was of sound mind when he left for the camp. None of the witnesses saw him after he became sick. There was no testimony that the relations between Bennett and his father and sister were otherwise than those usually and generally subsisting between persons bearing such relations to each other, nor was there any suggestion that their relations were not cordial or affectionate. In regard to his personal relations with them, a witness, J. S. Stilley, testified: "I knew George M. Bennett; have known him all my life. He had been living with Mr. Lewis for five or six years before he went to Camp Jackson. I know his hand-writing. I have examined this paper, including every part, the signature and all. It is in the handwriting of George M. Bennett. He was twenty-five or thirty years old. The last time I saw him was when he went off to Camp Jackson. At that time he was in his right mind so far as I know. When he was drafted he was living one-half or three-quarters of a mile from his father. I have seen him at his father's house two or three times when his father was sick; he had been sick, but was well before George went off. I have never had a conversation with Mr. Joseph Lewis in which he made a statement to me about the young man's sanity. I just cannot remember when his mother died. His sister lived one-half to three-quarters of a mile from him. He associated with her once in a while. I know this handwriting, it is George Bennett's. He refers to his sister's daughter as `Dear Kate.' This is his handwriting, dated 18 October, 1917; and this, too, dated 5 November, 1917. Mr. Lewis was a farmer. George M. Bennett worked with him on the farm. I just know about where I have been told that tract of land lies. I do not know who was in possession. I do not know whether it was land owned by his father." While we state this testimony literally, as it appears in the record, and the substance of the rest of it, it may not be very material, except as bearing in a general way upon the intention of Bennett to make his letter of 11 November, 1917, his last will and testament.
The caveators requested that the following instructions be given to the jury:
"1. If you believe the evidence, and find the facts to be as it tends to prove, you will answer the issue `No.' Refused, and caveators excepted.
"2. That one of the controlling factors in determining whether a paper-writing propounded for probate as the last will and testament of the writer is, that the writer of the instrument had, at the time of writing it, the intention to dispose of his property by the same, and even if the jury should find from the evidence that the testator wrote the paper in question and intended to dispose of his property in the manner therein set out, he did not intend for said instrument to be his will, but *Page 8 
intended to execute another instrument setting forth the disposition of his property, then, in that event, the paper-writing propounded would not be the last will and testament of said Geo. M. Bennett, and you should answer the issue `No.' Refused, and caveators excepted."
The jury found the issue in favor of the propounder. Judgment upon the verdict, and defendant appealed.
after stating the case: The learned judge who presided at the trial of this case should have directed the jury to answer the issue in favor of the caveators, or, in other words, "No," as there was no evidence, in a legal sense, that the paper-writing, which was propounded by the beneficiary named in it, and, thereafter, admitted to probate in common form, or any part thereof, was the will of George M. Bennett, the supposed testator, or the miscalled testator.
By our statute the Legislature has made careful and safe guarding provision for the execution and probate of wills, they being the last expression of the intention of their makers regarding the disposition of their property after death, and we have held repeatedly, as we should have held, undoubtedly, that these provisions must be scrupulously observed and followed in all essential respects, and with substantial precision, or at least accuracy. Rev., 3113, 3127 (1 and 2). The object of the law is that there may be no doubt as to the intention of the supposed testator to make his last will and testament, and as to the fact of his having done so by the particular writing offered for probate, thereby identifying it as the true and only document defining his intentions to will his estate and his purpose as to how it should be disposed of after his death. The two intentions to make a will and to dispose of his estate in the manner described in the paper-writing in question must concur and coexist. While a will must be contained in a writing, no formal testamentary instrument is required. If it adequately sets forth a testamentary intent it is enough. In many instances wills have taken the form of other instruments, while in others they have been wholly informal. A will may take the form of an assignment, or of a deed, or of a power of attorney, or of a letter, or of a promissory note, or of an order, etc., say the authorities. It may assume the form of any instrument, or be absolutely informal. This principle is well settled and numerous examples of such wills are to be found in the law books and decisions of the Courts here and abroad. Gardner on Wills (1st ed.), pp 36 to 43, and the Courts have gone very far to support such documents as valid wills, but at the same time they have required sufficient *Page 9 
certainty and assurance as to the intention to presently, or at the time the particular document comes into existence, make a will, and as to that paper being the very will he intended to make. Gardner, at p. 40, says: "So a letter written by a testator to a friend, authorizing him to take charge and dispose of the testator's property, and to sell and convey the same as his executor, properly attested, sufficiently evidences the testator's intention to dispose of his property, and may be probated as a will. But a letter, like any other instrument, to take effect as a will, must be executed in compliance with the requirements of the statute, and must express a genuine present and not merely an anticipated testamentaryintent,"
Mr. Jarman, in his work on Wills (6 ed.), p. 21, says, in substance at least: "The law has not made requisite to the validity of a will that it should assume any particular form, or be couched in language technically appropriate to its testamentary character. It is sufficient that the instrument, however irregular in form or inartificial in expression, discloses its testamentary character and the intention of the maker respecting the posthumous destination of his property; and if this appears to be the nature of its contents, any contrary title or designation he may have given to it will be disregarded."
In the case of In re estate of C. B. Richardson (appeal of Nina R. Hardee), 94 Calif., 63, the Court held that a letter, which merely expressed a desire that his sister and her children get everything he owned, but containing words indicating that they should take it by a formal will, or by one he would make, was not testamentary in character, but only the expression of a desire, it clearly not being the intention that the letter should be so construed as to become his last will. It is argued that many cases held that such a letter constituted a will, but with this statement we cannot agree. Those referred to manifestly contained evidence of an intention to then devise and bequeath the writer's estate, or, in other words, that the letter should have a present and full operation as a will, leaving nothing to be done in the future in respect to the matter. But here there is on the face of the letter an expression which clearly indicates the intention that it should not itself be Bennett's will, but that some other document, more formal in character, should be, and this he would have fixed if he had a chance. The general tenor of the will shows an expectation, if not a confident hope, of his restoration to health. He expresses the hope that "God will be with them until they meet again."
He was not in extremis, even if quite ill with measles, as his temperature was 104, or 5 2/5 degrees above the normal, and he felt badly. He anticipated, though, that he would eventually carry out his wish, when better able to do so. The language of the paper is but the manifestation *Page 10 
of his purpose to do something in the future, but is, by no means, a present testamentary disposition of his property. It is more an expression of his gratitude for past favors, and a desire to reward the propounder in the future by willing him property. We cannot hold, under our law, that it rises to the dignity and solemnity of a last will and testament.
The statute requires, in the case of holographic will, that the paper be deposited with some person for safe keeping, unless it is properly attested, or is found among the valuable papers and effects of the maker. This letter bears no evidence on its face nor is there any proof otherwise that Bennett intended that it should be deposited with the propounder, or any one else, for safe keeping. There is no request that he keep or preserve the letter, or that he do anything more with it than he would with any ordinary or casual letter received from him, or any other person.
The case of Haberfield v. Browning, 4 Vesey, Jr., 200, referred to inMathews v. Warner, 4 Vesey, Jr., at p. 200 (31 Full Reprint Series of Eng. Reports, p. 102), is sometimes relied on to sustain papers of this kind as wills. That was a case of instruction to an attorney to draw up a will, which, for special reasons, was held as a valid will. But in Mathews v.Warner, 4 Vesey, Jr., 186, it was insisted that it did not apply to a case of this kind, "where upon the face of the paper it is not intended as a testamentary disposition." There is no present disposition, nor did the deceased ever intended by signing it, "that it should immediately operate," adding that "there are many sensible passages applicable to the subject in Shep. Touchstone, 404 to 408." The Court, by so famous a judge as LordLoughborough, accepted this contention as sound and correct.
We cannot refrain from adding to this opinion the great weight of that able jurist's view as expressed by him in Mathews v. Warner, supra: "under all these circumstances, with this evidence, and above all, the evidence of the paper itself, I should have no difficulty, sitting as I have sat in a Court of Law, to put it so to the jury, that I should expect a verdict that he had not devised; that it was no will, but only a project of a will, not a complete, definite rule and law for settling his fortune. It is not, it cannot, be denied, the argument presses so strong, that upon the perusal of this paper the natural conclusion is that it was his intention to make a more formal paper than this. That inference cannot possibly be avoided. Then ex hypothesi this paper at the time he subscribed it was not the law, the testament. When then, at what period, did the voluntas testandi exists in his mind quoad this instrument? If it is admitted, as it must be, that when he subscribed his name he was looking to some future act, the decision that this is his will would *Page 11 
destroy the most general maxim I know of, `voluntas testatoris ambulatoriaest usque ad mortem.' No man can answer the question, at what time that intention existed in his mind. I know there was a period when a contrary intention existed. He has given that evidence under his own hand by the paper of 1789. Under all these circumstances, I should have felt myself obliged, as an act of duty, strongly to press upon the consideration of the jury the utter impossibility upon the fair view of the evidence of making the supposition, that this was the will, and I must have added another circumstance, that it was his last will. The manner in which it was kept, with so little attention, the place where it was found, these circumstances are always of great consideration. But though that is the bias of my mind, I am very far from saying it may not be a necessary conclusion in the Court, which is to decide by other maxims than we are acquainted with here, that this will may be established; but I wish the point, after it has been well canvassed and considered, to be felt as a point of great weight and importance; and if such things are to be established as wills, it loudly requires the interference of the Legislature to prevent such a latitude in that respect as makes the disposing of all a man's fortune the most slight and trivial act, attended with much less of form, solemnity, and precision than any act he could do with regard to any one part of his property during his life."
Suffice it to say, that the best considered and weightiest authorities upon this important question hold with us that a paper, such as this, is not, in law, a last will, and this case, we think, by reason of its special facts and the peculiar language of the paper, especially that of the last clause, is much stronger for the caveators than any one in the large group which support their view.
It is impossible to read the paper now before us for consideration, and come to the conclusion that it is a testamentary one. It states merely an intention to execute something in the future as his will, which he may or may not do after fuller consideration, for, as said by Lord Loughborough,supra, and translating his Latin, "the will of a testator is ambulatory even to his death," which means, in other words, that it is not fixed legally, but may be changed even to the time of his death.
There is also nothing in the language used which shows an intention to deposit the paper "with some person as his will," but is a casual letter, written and mailed only as is a letter in any correspondence, and not attended by the solemnity which is, and should be, required in executing so important an instrument as a will.
The cases of Spencer v. Spencer, 163 N.C. 83, and In re Will of Ledford,176 N.C. 610, belong to that class of cases we have mentioned above, where the letters showed that they were written animo testandi, and that they should operate as wills, and not some other paper to be *Page 12 
written in the future. In the Spencer case the Court said: "The distinguishing feature of all genuine testamentary instruments, whatever their form, is that the paper-writing must appear to be written animotestandi. It is essential that it should appear from the character of the instrument, and the circumstances under which it is made, that the testator intended it should operate as his will, or as a codicil to it. In the case at bar the testator had made his will in New York City on the eve of his departure for a European trip. This so-called codicil is a letter written to his brother immediately after he had executed his will, and makes no reference to it. It is scarcely probable that the testator regarded, or intended, such a letter to be in any sense a part of his will. 1 Redfield on Wills, star p. 174, and notes; St. Johns Lodge v. Callendar,26 N.C. 335; Simms v. Simms, 27 N.C. 684." This language, or the essential part of it, was quoted and approved in the Ledford case Alston v. Davis,118 N.C. 203, was overruled. The case of Milam v. Stanley, 17 L.R.A. (N.S.), 1126, was decided upon the same principle. The Court there said: "The letter shows on its face that it is inartificially written, but his meaning is sufficiently apparent. He did not have in mind that he was thereafter to make his daughters a deed to the house and lot. (Quoting language of letter.) These words show that he had in mind, not something that he was going to do, but something that he was then doing. In other words, they show that he intended them to have the house and lot by virtue of the letter he was then writing, and not by virtue of some instrument he was thereafter to write."
It is not necessary to discuss the question whether the words of the statute, "or was lodged in the hands of some person for safe keeping" (Rev., 3127 (2)), meant some third person, or one not a beneficiary.
The court erred in its instruction to the jury, and in not giving the caveators' prayers.
New trial.