IN RE LAST WILL AND TESTAMENT OF JENNY WESTFELDT, DECEASED.

(Filed 10 December, 1924.)

**1. Appeal and Error—Briefs—Objections and Exceptions.**

To be considered on appeal under the rule of court, exceptions of appellant appearing of record must be mentioned and discussed in his brief.

**2. Instructions—Appeal and Error—Objections and Exceptions.**

Where the charge of the judge to the jury does not appear of record, the presumption is that the instructions given were correctly given upon competent evidence introduced upon the trial.

**3. Wills—Caveat—Evidence—Nonsuit—Actions—Parties.**

Proceedings to caveat a will are *in rem* involving the rights of the beneficiaries as named in the will, and those of the opposing heirs at law or next of kin depending upon the answer to the issues of *devisavit vel non*, and there being no parties, strictly speaking, upon whom a judgment as of nonsuit may be taken, the issue should be tried in the due course and practice of the court, and a motion as of nonsuit should be denied.

**4. Judgments—Evidence—Motions to Set Aside—Discretion of Court—Wills—Caveat.**

A motion to set aside a verdict as being against the weight of the evidence, and the consequent granting of a new trial upon the issue of *devisavit vel non*, is within the sound discretion of the trial judge.

**5. Wills—Evidence—Holograph Wills.**

Evidence that a paper-writing purporting to be the last will and testament of the deceased, wholly written and signed by her, was found among her valuable papers after her death, in a, desk where she kept her business papers, and those she desired to keep for their sentimental value to herself, and transferred after her death to her trunk where they were found, *is held* sufficient, under the circumstances of this case to sustain the verdict of the jury and deny the caveator's motion as of nonsuit.

**6. Same—Mental Capacity—Statutes.**

There being evidence upon the trial of the issue of *devisavit vel non* that the deceased had sufficient mental capacity to execute the paper-writings being propounded as her will, that she was aware of the nature, extent and value of the property, and those whom she wished to have it, etc., the issue was properly submitted to the jury. C. S., 4144.

**7. Wills—Holograph Wills—Witnesses—Beneficiaries—Void Legacies—Statutes.**

One who is a beneficiary under a holograph will may testify to such competent relevant and material facts as tend to establish it as a valid will without rendering void the benefits he is to receive thereunder. C. S., 1792, 1793. It is otherwise as to an attesting witness of a will that the statute requires to be attested by witnesses thereto. C. S., 4138.

IN RE WESTFELDT.

**8. Wills—Interpretation—Several Writings—Repugnancy—Implied Revocation.**

Where there are several papers purporting to be a valid holograph will, reconcilable in their terms, the fact that none of them were dated or the time of their execution offered in evidence is not material, and the principle that a later will inconsistent with a former one repeals the latter to the extent of the repugnancy, has no application.

APPEAL by caveator from *Finley, J.,* and a jury, May-June Term, 1924, of HENDERSON.

On 22 July, 1922, Jenny Fleetwood Westfeldt had probated in Henderson County certain paper-writings as the last will and testament of the late Jenny Westfeldt. On 3 October, 1923, caveat was filed thereto; and at the May-June Term, 1924, of the Superior Court of said county, the issue of *devisavit vel non* was tried.

Jenny Fleetwood Westfeldt, the propounder, alleges that certain paper-writings propounded by her were the last will and testament of the said Jenny Westfeldt, deceased, and the caveator alleged that such paper-writings were not the last will and testament of the said decedent.

The said paper-writings are as follows:

PROPOUNDER'S EXHIBIT 1.

"If anything happens to me take care of Lulie and Jenny and let my portion of the Rugby Grange property go to them equal parts for each and if there be anything to build them a home with do so—I want to help Alice to get a home too.

(Signed) JENNY WESTFELDT,
RUGBY GRANGE.

"December 22d, 1914."

PROPOUNDER'S EXHIBIT 2.

"May 22; 15 and September 30, 1915.
"Frankfort, Ky.

"I leave to Lulie Westfeldt, daughter of Patrick Westfeldt, the half of my property and to Jenny Fleetwood Westfeldt the other half—to revert to Lulie Westfeldt in case of Jenny Westfeldt's decease, and should Lulie Westfeldt die without heirs the property to go to Overton Westfeldt Price's children—I leave to Christine Price $1,000, Christine Reynolds $1,000 and to Deaver Lance $300 and to my servants Josephine Clayton, Ella Prince $100 each, to Gertrude and Josephine Pinner $50 each.

"To C. R. Westfeldt whatever he may care for from the Grange, books, furniture, pictures, etc., to M. C. W. Price what she would care

for from the Grange. The silver to be divided between Jenny F. W.—Janey Westfeldt. I want all the heirs to have something of mother's from the Grange. The silver cream pitcher is Christine Reynolds' the water kettle is Lulie's, the tea pot is Ethel Jane's—the china is also to be Lulie's and Jenny's, Barbara's, Dorothy's and Janey's.

"(Signed) Jenny Westfeldt."

"Mother's and (fathers)? picture is for Kitty Monroe and the Madonna is for Martha—the English Park is Jenny's and the big painting in the hall is to go to the Del Gardo. The books are for Bo first, Wallace, G. R. Jr., and Jenny. The piano is Sissy's and her crayon and the children's are Alice's—the furniture to be divided.

"(Signed) Jenny Westfeldt."

"I am thinking of them all—Louise and Mary and Llew included and leave Dot and Sister there          Dear Jenny F. carry out my wishes."

Propounder's Exhibit 3.

"January 25th.

"I want $3,000 paid to Christine Reynolds and $3,000 to my sister Christine W. Price and if Hunt's gold mine is a success and takes good care of Jenny F. Westfeldt the rest of my property I leave to Lulie Westfeldt. If the gold mine proves not a success I leave my property as I wrote before.          "(Signed) Jenny Westfeldt."

The beneficiaries under the paper-writings propounded as the will of Jenny Westfeldt and her heirs at law and next of kin were all notified and citation issued in accordance with law. Guardians *ad litem* were duly appointed for all the infants.

The following issues were submitted to the jury:

"Is the paper-writing propounded by Jenny Fleetwood Westfeldt, and consisting of three separate sheets marked (Propounder's Exhibits 1, 2 and 3) and every part thereof, the last will and testament of Jenny Westfeldt, deceased?   Answer: 'Yes.'"

The court below rendered judgment that the said paper-writing and every part thereof, as above set forth and offered for probate by propounder, as the last will and testament of Jenny Westfeldt, deceased, is the last will and testament of Jenny Westfeldt, deceased.

The caveator, Gustaf R. Westfeldt, made exceptions and assignments of error set forth in the record, and appealed to the Supreme Court.

*Jones, Williams and Jones, Eubank & Whitmire, and Haywood Parker for propounder, appellee.*

*Albert L. Cox for caveator, appellant.*

CLARKSON, J. The caveator, in his brief, says: "The trial judge erred in refusing the motion of the caveator, made at the close of the propounder's evidence and all of the evidence, to dismiss the action and proceedings and for judgment as of nonsuit against the propounder, and to this error of the judge this argument will be principally directed. The trial judge likewise erred in overruling motion of caveator to set aside the verdict, which error will be included in this argument."

"Exceptions in the record not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him." Rules of Practice in the Supreme Court, 185 N. C., p. 798—part of rule.

The caveator introduced no evidence. The record fails to show that he prayed any special instructions. The charge of the court below is not in the record.

In *Indemnity Co. v. Tanning Co.*, 187 N. C., p. 196, it was said: "The presumption of law from the record is that the court below charged the law correctly bearing on the evidence as testified to by the witness at the trial."

So, the only thing for us to consider, on all the evidence of the propounder, is—should the proceeding be dismissed or judgment as of nonsuit rendered against the propounder and the verdict and judgment be set aside?

The propounder contends that, on the record, no judgment of nonsuit could have been properly entered or the case dismissed, that the proceeding is *in rem*.

In *Collins v. Collins*, 125 N. C., p. 104, *Faircloth, C. J.*, said: "This is a proceeding *in rem* and the statute confers jurisdiction on the clerk of the court. There are no parties, strictly speaking, certainly none who can withdraw or take a nonsuit, and thus put the matter where it was at the start, as in actions between individuals. A nonsuit in the latter case affects no one but the litigants; in the former, creditors, legatees and distributees are interested and they are stayed until the question of testacy or intestacy is determined. The court having *jurisdiction*, public policy and our statutes require that this preliminary question should be determined as soon as practicable, and require the court to do it, regardless of objecting persons. *Hutson v. Sawyer*, 104 N. C., 1." *In re Hinton's Will*, 180 N. C., p. 214.

The question of setting aside the verdict and granting a new trial is a matter within the sound discretion of the court below. 15 Enc. Digest of N. C. Rep., p. 112, and cases cited.

The contention of propounder is sustained by authorities in this jurisdiction, but we will consider the evidence in the record in the light most

45—188

favorable to caveator. On the whole record, should the verdict and judgment be disturbed—as contended by caveator? We think not.

The testimony of Jenny Fleetwood Westfeldt, the propounder, and other witnesses, to establish the validity of the paper-writings as the will of Jenny Westfeldt, is undisputed. Dr. H. M. Fletcher, a physician, testified: "I was born and reared in Fletcher and knew the late Miss Jenny Westfeldt all my life. I knew her very well as a neighbor and friend and knew her after I began practicing medicine as being her physician for a time. In my opinion, in 1914 and 1915, and up to and including the time that I last saw her, on 24 December, 1919, she had mind and intelligence sufficient to enable her to have a reasonable judgment of the kind and value of the property she proposed to will and to whom she was willing to will it. I would say that she had a strong mind and strong will. I was not related to her by blood or marriage."

The paper-writings found were not witnessed, but propounded as a holograph will. C. S., 4144, sec. 2, is as follows:

"In case of a holograph will, on the oath of at least three credible witnesses, who state that they verily believe such will and every part thereof is in the handwriting of the person whose will it purports to be, and whose name must be subscribed thereto, or inserted in some part thereof. It must further appear on the oath of some one of the witnesses, or some other credible person, that such will was found among the valuable papers and effects of the decedent, or was lodged in the hands of some person for safe-keeping.

More than three witnesses—the jury found credible—testified that the paper-writings (propounder's Exhibits 1, 2 and 3) were in the handwriting of Jenny Westfeldt. They were familiar with her handwriting and had often seen her write. One witness, Jenny Fleetwood Westfeldt, under the paper-writings was a legatee and devisee. Her evidence was competent.

"At common law one who had a direct legal interest in the event of the suit was thereby disqualified as a witness on the side of his interest, but the Revisal, secs. 1628, 1629 (C. S., 1792, 1793), removes such disqualification, and now no person offered as a witness shall be excluded by reason of his interest in the event of the action. By Revisal, sec. 3120 (C. S., 4138), devisees and legatees may be attesting witnesses to wills, but their devisees and legatees, and any devises and legacies left to their husbands and wives or to any one claiming under such devisees or legatees, are void. But the section only applies to *attesting* witnesses, and devisees and legatees may be witnesses to prove holograph wills without losing their devises and legacies." Lockhart's Handbook on Evidence, sec. 39, *McEwan v. Brown,* 176 N. C., p. 252.

There was no evidence that these paper-writings were "lodged in the hands of some person for safe-keeping," so the question involved here is—were these paper-writings "found among the *valuable papers and effects* of the decedent."

Jenny Westfeldt was the owner of "Rugby Grange," a home in Henderson County, where she died on 8 June, 1921, at the age of 76 years. Ella Prince ( colored) for about 25 years was employed as her maid. She testified that Jenny Westfeldt kept her valuable papers in a desk drawer in her bedroom. She had a waste basket that was beside her desk that she put old papers and letters and things in she did not want and had them thrown away. She remained a few days after the death of Jenny Westfeldt, her employer. She testified, in part: "Miss Jenny Fleetwood Westfeldt gave me instructions about packing Miss Westfeldt's property.

"A. I first taken all papers, books and letters from Miss Jenny Westfeldt's drawer and put them in the tray of the trunk, and then I got all her wearing clothes and packed what I could in the trunk and the other parts of her clothes I put somewhere else.

"Q. Did you or did you not remove all the contents of the desk? Answer: 'Yes, I removed all.'

"Q. Where did you put all the things that you took out of Miss Jenny Westfeldt's desk? Answer: 'Into Miss Jenny Westfeldt's trunk.'

"Q. Where did you put the papers from Miss Westfeldt's desk? Answer: 'Into Miss Westfeldt's trunk.'

"Q. Where was the trunk? Answer: 'In the upstairs hall.'

"Q. Did you know who had the key to the trunk? Answer: 'I gave it to Miss Jenny Fleetwood Westfeldt.'

"Q. Did you lock the trunk before you gave it to her? Answer: 'Yes.'

"Q. When you took Miss Westfeldt's things out of the desk, where did you put this book? Answer: 'I put it in the trunk.' "

When she put the papers in the trunk, she testified, there was a little bundle of papers in the trunk, one package of papers tied up with a string, and some clothing.

Jenny Fleetwood Westfeldt testified, in part: "I found those papers, introduced as propounder's Exhibits 1, 2 and 3, among my aunt's valuable papers in her trunk with which she had traveled about three weeks before she died, and in which all papers from her desk had been put. The papers were put from her desk into the trunk by her maid, Ella Prince. I gave Ella Prince directions about them. My aunt, Jenny Westfeldt, kept her valuable papers in her desk in her bed room at Rugby Grange. The desk was a flat-top desk with five drawers, two on each side and one in the middle. She kept in this desk her canceled

checks and receipted bills and business letters and statements of account from Westfeldt Brothers of New Orleans. . . . Lulie Westfeldt, my cousin, and Thomas Dugan Westfeldt and I went through her trunk to divide my aunt's wearing apparel. . . . After we got through dividing the things, I said, 'Let's wait, that we could look at those papers some other time. We could do that at any time, and we will put all of those papers back in the trunk'; and my cousin, Tom Westfeldt, said, 'Oh! no, it won't take long, let's do it now.' And we sat down around the trunk and went through the papers and were discarding papers and tearing papers up that were not any longer valuable, and my cousin Lulie found one of these papers, and I think Tom Westfeldt found the other two. I don't think I found any. I refer to 'propounder's Exhibits 1, 2 and 3.' That same night I found statements of account of Westfeldt Brothers and canceled checks. We found statements of account between my aunt and Westfeldt Brothers in my aunt's trunk at the same time we found the Exhibits 1, 2 and 3. . . . Yes, five bank stub books came from my aunt's trunk, likewise a contract for a telephone, likewise an account of Westfeldt Brothers and I think a farm account, and likewise a statement to the stockholders from the Trust Company of Norfolk, Va., dated 1 July, 1919, and likewise a box of paid checks. There also came from the trunk at this time a paper signed by the president of the Trust Company in Norfolk, dated 21 July, 1920."

Valuable papers and effects mean more than papers that have a pecuniary or money value. Papers that have a sentimental and personal value are sometimes more precious and valuable to men and women than stocks and bonds. Sometimes these letters and mementoes of the past are most tenderly kept, frequently in trunks, according to the particular person's condition, business and habits of preserving papers. In the trunk was found the diary of Jenny Westfeldt's mother from the year 1863, and a package labeled "My precious treasures." Lulie Westfeldt testified, in part: "Tom Westfeldt sat down on the floor and started untying the parcels. The papers were in packages tied up with elastics, and Jenny Fleetwood Westfeldt and I sat down and did the same thing, untied packages or papers and examined them and those packages or papers contained personal letters, receipts, canceled checks, business letters, and there was a diary. One of the packages was labeled in my aunt's handwriting. . . .

"Q. What was the label on the package? Answer: 'My precious treasures.'"

Among these papers in the trunk were found the paper-writings Exhibits 1, 2 and 3.

"Valuable papers consist of such as are regarded by a decedent as worthy of preservation, and therefore in his estimation, of some value; depending much upon the condition and business and habits of the decedent in respect to keeping his valuable papers." *Winstead v. Bowman,* 68 N. C., 170.

"What is meant by *valuable* papers? No better definition perhaps, can be given, than that they consist of such as are regarded by the testator as worthy of preservation, and, therefore, in his estimation, of some value. It is not confined to deeds for land or slaves, obligations for money, or certificates of stock. Any others which are kept and considered worthy of being taken care of by the particular person, must be regarded as embraced in that description. This requirement is only intended as an indication on the part of the writer, that it is his intention to preserve and perpetuate the paper in question as a disposition of his property; that he regards *it* as valuable." *Marr v. Marr,* 39 Tenn., 306.

The charge of the court not appearing in the record, it is to be presumed that the court below charged the law in accordance with the evidence. Under the evidence, the jury were warranted in finding that at the death of Jenny Westfeldt the paper-writings were among her valuable papers and effects in her desk, and after her death put in her trunk by her maid, Ella Prince. If paper-writings, Exhibits 1, 2 and 3, were not in the desk and put in the trunk, under the evidence, the jury were warranted in finding that the paper-writings found in her trunk were found among other valuable papers and effects of deceased.

*Ashe, J.,* in *Brown v. Eaton,* 91 N. C., p. 30, said: "Where a person has two or more depositories of his valuable papers and effects, the *finding* in either will suffice. It is not necessary it should be found in that which contains the most valuable papers and effects. *Winstead v. Bowman,* 68 N. C., 170." *Hill v. Bell,* 61 N. C., p. 122; *Hughes v. Smith,* 64 N. C., 493; *Cornelius v. Brawley,* 109 N. C., 542; *In re Sheppard's Will,* 128 N. C., 54; *Harper v. Harper,* 148 N. C., 453.

It is contended by caveator that Jenny Westfeldt did not have *"animus testandi."* This contention might well be resolved against the caveator, on the face of the paper-writings, but if not, the presumption by the record is that this aspect was submitted to the jury.

In the case of *In re Harrison,* 183 N. C., 459, *Stacy, J.,* says: "The *animus testandi* of Mrs. Harrison being doubtful, or, at least, ambiguous, as appears from the face of the instrument, we think his Honor was justified in submitting the question to the jury for determination. 'It is essential that it should appear from the character of the instrument and the circumstances under which it was made that the testator

intended it should operate as his will, or as a codicil to it.' *In re Bennett*, 180 N. C., 5." *In re Southerland, ante,* 325.

It was contended by caveator that the three paper-writings were not in harmony so that they may be upheld as one will—uncertain as to date, inconsistent and mutually destructive of each other, nothing on the face of the papers to prove which is the latest expression of the intent of the deceased. That they were "found in separate packages. There were more than a dozen packages in the tray of the trunk, consisting of old letters, canceled checks, etc., and among such papers was one referred to by Lulie Westfeldt as the fourth paper and which read as follows: 'Take care of Lulie, comfort Lulie if anything happens to me '17'; while on the other side was written four names: 'Pink, Jenny, George, Alice.' The paper was in an envelope."

A fresh will, with no clause expressly revoking the old will, may impliedly revoke it by dispositions so inconsistent with those in the old will that they could not have been intended to stand together.

The general principle is that "The mere fact of making a subsequent testamentary paper does not work a total revocation of a prior one, unless the latter expressly or in effect revoke the former, or the two be incapable of standing together: for though it be a maxim, as Swinburne says above, that 'no man can die with two testaments,' yet any number of instruments, whatever be their relative date, or in whatever form they may be (so as they be all clearly testamentary), may be admitted to probate as together containing the last will of the deceased. And if a subsequent testamentary paper, whether in form a will or a codicil, be partially inconsistent with one of an earlier date, then such latter instrument will revoke the former as to those parts only where they are inconsistent." Williams on Executors (Vol. 1) 7 Amer. Ed., p. 212.

"If, from the absence of date and of every other kind of evidence, it is impossible to ascertain the relative chronological position of two conflicting wills, both are necessarily held to be void, and the heir as to the realty, and the next of kin as to the personalty, are let in; but this unsatisfactory expedient is never resorted to until all attempts to educe from the several papers a scheme of disposition consistent with both, have been tried in vain. And even where the times of the actual execution of the respective papers are known, so that if they are inconsistent, there can be no difficulty in determining which is to be preferred, the courts will, if possible, adopt such a construction as will give effect to both, sacrificing the earlier so far only as it is clearly irreconcilable with the latter paper; supposing, of course, that such latter paper contains no express clause of revocation, or other clear indication of a contrary intention." Jarman on Wills (Vol. 1) 6 Ed., p. 172. *Hyatt v. Hyatt*, 187 N. C., p. 113.

We said in *Kidder v. Bailey,* 187 N. C., p. 508 : "Where the language is clear as to the intent of the testator and there is no latent ambiguity, there can be no extrinsic proof. In *McDaniel v. King,* 90 N. C., 602, *Merrimon, C. J.,* said : 'If a will is sufficiently distinct and plain in its meaning as to enable the court to say that a particular person is to take, and that a particular thing passes, that is sufficient, and it must be construed upon its face without resorting to extraneous methods of explanation to give it point. Any other rule would place it practically within the power of interested persons to *make* a testator's will, so as to meet the convenience and wishes of those who might claim to take under it.' *Williams v. Bailey,* 178 N. C., 632."

We cannot agree with the contentions of caveator. We think the paper-writings on the face (except one word we do not think material) are not inconsistent and mutually destructive of each other. All the papers can be reconciled and harmonized, showing a clear intent of testatrix. The setting surrounding the testatrix when the paper-writings were signed, the home conditions and family relationship, when shown, as was proper and done on the trial below, makes it clear as to the disposition of the property—the persons taking and the things taken. The exact dates are immaterial from the facts here. The paper-writing 4th is no will, but a loving request to care for one whom, the record shows, had lost her mother a few days after her birth and had been from her infancy a tender care of the testatrix. She was lame from early childhood. On account of this sorrow and affliction, no doubt, the heart of the old aunt who took a mother's place, went out especially to Lulie Westfeldt, as shown in this request and the special provision made for her in the paper-writings in controversy.

From a critical examination of the entire record, we can find,

No error.